=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 33
Raul Barreto,
            Appellant,
et al.,
            Plaintiff,
        v.
Metropolitan Transit Authority,
et al.,
            Respondents.
(And other Third-Party Actions.)

            John M. Shaw, for appellant.
            Patrick J. Lawless, for respondents Metropolitan
Transportation Authority et al.
            Suzanne Paulson, for respondent City of New York.
            Clifford I. Bass, for respondent IMS Safety Corp.

PIGOTT, J.:

            Plaintiff Raul Barreto, an asbestos handler employed by

asbestos removal contractor P.A.L. Environmental Safety Corp.

(PAL), allegedly sustained on-the-job injuries after falling

through an uncovered manhole in Manhattan at a location owned by

the City of New York (City), which had been leased by the City to

- 1 -

the New York City Transit Authority (NYCTA).  NYCTA, on behalf of
the Metropolitan Transportation Authority (MTA), retained PAL to
perform asbestos removal from electrical cables underneath city
streets.  PAL directly contracted with IMS Safety Inc. (IMS) to
serve as site safety consultant.

Prior to the commencement of the work, PAL employees
constructed a three-sided wooden containment enclosure around the
manhole.  Plastic sheets were placed on the ceiling and the floor
of the enclosure.  The plastic sheet on the ceiling was stapled
and glued to two 2 x 4's, forming an "X" over, and framing, the
enclosure.  Two sets of double plastic sheets were hung in the
open side of the enclosure approximately four feet apart.  A
circle was cut out of the plastic floor to account for the 3-4
foot in diameter manhole.  Two lights illuminated the enclosure.

Before the manhole cover was removed, an MTA foreman
conducted an inspection to ensure that the electrical cables were
not live.  Due to the weight of the manhole cover, two PAL
workers were required to remove the cover and place it outside
the enclosure.  IMS thereafter checked the underground air
quality inside the open manhole and apprised PAL workers that it
was safe to begin work.  PAL workers descended approximately ten
feet by way of a ladder and began the asbestos removal work.  At
the conclusion of their shift, plaintiff and his coworkers were
required to bring up the asbestos-filled bags, remove their
protective equipment and the ladder, and replace the manhole

cover before disassembling the containment enclosure.

PAL workers, including plaintiff, finished their shift at approximately 4:00 a.m. on the day of the accident.  After plaintiff and his coworkers exited the manhole, they proceeded to break down the containment area "right away."  Plaintiff did not notice that the manhole remained uncovered, and, during the break down, the manhole cover remained outside the enclosure.  According to plaintiff, the lights inside the enclosure had been turned off.  As plaintiff walked toward the rear of the enclosure to disassemble the 2 x 4's from the ceiling, he fell into the open manhole.

I.

Plaintiff commenced this action against defendants IMS, City, NYCTA and MTA alleging violations of Labor Law §§ 200, 240 (1) and 241 (6) and common law negligence.  At the conclusion of discovery, all defendants moved for summary judgment to dismiss plaintiff's complaint and any relevant cross claims asserted against them.  Plaintiff cross moved for partial summary judgment against all defendants on his section 240 (1) and 241 (6) claims, and for partial summary judgment against IMS, NYCTA and MTA on his common law negligence and section 200 claims.[1]

Supreme Court dismissed plaintiff's complaint against all defendants on the ground that plaintiff was the sole

---

[1] Plaintiff discontinued his common law negligence and section 200 claims against the City.

proximate cause of his injuries because he disregarded his supervisor's instructions by dismantling the containment enclosure before the manhole cover was replaced. The court reasoned that had plaintiff waited for the manhole to be covered before commencing the deconstruction of the enclosure, he would not have fallen through the open manhole.

A divided Appellate Division affirmed, holding, as an initial matter, that IMS was not a statutory agent subject to liability under any of plaintiff's theories because it lacked the authority to supervise plaintiff or his work (110 AD3d 630, 632 [1st Dept 2013]). The court also dismissed plaintiff's section 240 (1) claims against the remaining defendants, noting that plaintiff was provided with a "nearby and readily available" safety device, i.e., the manhole cover, and plaintiff's own actions were the sole proximate cause of his injuries because he disregarded his supervisor's instruction to replace the manhole cover before dismantling the containment enclosure (id.). It also dismissed the section 241 (6) claims because, in its view, none of the alleged Industrial Code violations proximately caused the accident (id. at 633). The common law negligence and section 200 claims against NYCTA and MTA were dismissed because they neither had notice of the defect nor supervised plaintiff's work (id. at 632-633).

The dissenting Justice agreed with the majority that IMS was not a statutory agent, but would have reinstated

plaintiff's Labor Law § 240 (1) claims against the City (as owner) and NYCTA and MTA because plaintiff was not the sole proximate cause of his injuries in light of the record evidence that it took at least two workers to move the manhole cover and because the lights may have been turned off before the deconstruction work had begun (id. at 634 [Feinman, J., dissenting, in part]).

The Appellate Division certified to this Court the question whether its order affirming the order of Supreme Court was properly made.

II.

Plaintiff is entitled to partial summary judgment against the City, NYCTA and MTA on his Labor Law § 240 (1) claims.  Section 240 (1) provides, in relevant part:

> "All contractors and owners and their agents
> . . . in the erection, demolition, repairing,
> altering, painting, cleaning or pointing of a
> building or structure shall furnish or erect,
> or cause to be furnished or erected for the
> performance of such labor [certain
> enumerated] and other devices which shall be
> so constructed, placed and operated as to
> give proper protection to a person so
> employed."

The statute imposes upon owners, contractors and their agents a nondelegable duty that renders them liable regardless of whether they supervise or control the work (see Cahill v Triborough Bridge & Tunnel Auth., 4 NY3d 35, 39 [2004]). "Where an accident is caused by a violation of the statute, the plaintiff's own negligence will not furnish a defense"; however, "where a

plaintiff's own actions are the sole proximate cause of the accident, there can be no liability" (id.).  Thus, in order to recover under section 240 (1), the plaintiff must establish that the statute was violated and that such violation was a proximate cause of his injury (see Zimmer v Chemung County Performing Arts, Inc., 65 NY2d 513, 524 [1985]).

The City, NYCTA and MTA do not contend on this appeal that the work plaintiff was engaged in at the time of the accident did not involve an elevation-related hazard, nor did IMS initially move for summary judgment on that ground.  Therefore, we assume, for purposes of this appeal only, that plaintiff was engaged in work that posed an elevation-related risk.

On his motion for summary judgment, plaintiff met his burden of establishing the absence of an adequate safety device through the submission of the deposition testimony of IMS's president, Joseph Mazzurco, who testified that there should have been a guard rail system around three sides of the open manhole while the containment enclosure was being dismantled.  Plaintiff also established that the absence of guard rails was a proximate cause of the accident because had they been in place he would not have fallen.

The Appellate Division erred in holding that plaintiff's conduct was the sole proximate cause of his injuries in light of the undisputed fact that it took at least two PAL workers to move the manhole cover (given its weight), and

plaintiff's testimony that the lights had been turned off prior to disassembly of the containment enclosure.  Therefore, plaintiff's conduct could not have been the sole proximate cause of his injuries, and plaintiff is entitled to partial summary judgment against the City, NYCTA and MTA on his section 240 (1) claims.

Supreme Court and the Appellate Division, having erroneously concluded that plaintiff was the sole proximate cause of his injuries, did not reach the merits of plaintiff's Labor Law § 241 (6) claims against the City, NYCTA and MTA.  Therefore, plaintiff's section 241 (6) claims should be reinstated, and we remit the matter to Supreme Court so it may consider the summary judgment motions that were brought relative to those claims.

### III.

The Appellate Division also erred in holding that IMS was not a "statutory agent" as a matter of law.  Given Mazzurco's testimony that it was part of IMS's responsibility to ensure that a guard rail system was in place and the manhole cover was replaced once the system was removed, there is a question of fact concerning whether IMS was a "statutory agent" subject to liability under Labor Law § 240 (1) (see Walls v Turner Constr. Co., 4 NY3d 861, 863-864 [2005]; Blake v Neighborhood Hous. Servs. of N.Y. City, 1 NY3d 280, 292 [2003] [no agency liability under section 240 (1) where responsibility for the activity that surrounded the injury was not delegated to a third party]).

Moreover, plaintiff submitted the affidavit of a PAL supervisor who averred that one of IMS's duties at the site was to ensure that the manhole was covered before PAL workers disassembled the containment enclosure, and that IMS had the authority to stop plaintiff from working in the area near the missing manhole cover. On this record, a jury could reasonably find that IMS "had the ability to control the activity which brought about the injury" (Walls, 4 NY3d at 863-864, citing Russin v Louis N. Picciano & Son, 54 NY2d 311, 317-318 [1981]).

For a similar reason, plaintiff's common law negligence and Labor Law §§ 200 and 241 (6) claims should be reinstated against IMS, as plaintiff raised triable issues of fact as to whether IMS, as a potential statutory agent, had the authority to supervise that portion of the work that brought about plaintiff's injury (see Rizzuto v L.A. Wenger Contr. Co., 91 NY2d 343, 353 [1998] [common law negligence and Labor Law § 200 claims]; Harris v Hueber-Breuer Constr. Co., Inc., 67 AD3d 1351, 1353 [Labor Law § 241 (6) claim]).

IV.

Finally, NYCTA and MTA met their respective burdens of establishing that they did not supervise or control plaintiff's work, or that either of them had notice of the alleged dangerous condition or defect (see Comes v New York State Elec. & Gas Corp., 82 NY2d 876, 877-878 [1993]). Plaintiff failed to raise a triable issue of fact in that regard. Therefore, the Appellate

Division properly dismissed plaintiff's common law negligence and section 200 claims brought against NYCTA and MTA.

Accordingly, the order of the Appellate Division should be modified, with costs to plaintiff Raul Barreto, in accordance with this opinion and, as so modified, affirmed, and the certified question not answered as unnecessary.

Barreto v Metropolitan Transportation Authority

No. 33



STEIN, J.(dissenting in part):

The majority and my dissenting colleague agree that the case should be decided as a matter of law; however, their opinions differ as to which of the parties should prevail. I take an alternative position and respectfully dissent, in part, because, in my view, triable questions of fact exist regarding whether defendants provided plaintiff with "proper protection" under Labor Law § 240 (1) and whether plaintiff's conduct was the sole proximate cause of his injuries.[1] Accordingly, I would hold that neither plaintiff nor defendants are entitled to summary judgment.

> Labor Law § 240 (1) provides that:
>
> "[a]ll contractors and owners and their agents . . . in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed."

When applicable, section 240 (1) imposes a non-delegable duty on owners and contractors to furnish their employees with "proper

---

[1] I, too, assume without deciding that the accident involved an elevation-related risk.

- 1 -

protection" (Labor Law § 240 [1]).  Therefore, once a Labor Law

§ 240 (1) violation and proximate cause are established, a

defendant cannot raise an injured employee's contributory

negligence as a defense (see Blake v Neighborhood Hous. Servs. of

N.Y. City, 1 NY3d 280, 287 [2003]; see also Stolt v General Foods

Corp., 81 NY2d 918, 920 [1993];  Bland v Manocherian, 66 NY2d

452, 461-462 [1985]; Zimmer v Chemung County Performing Arts, 65

NY2d 513, 521 [1985]; Koenig v Patrick Constr. Corp., 298 NY 313,

317 [1948]).

Our Court has observed that "the Legislature's intent

[is] to . . . protect[] workers by placing ultimate

responsibility for safety practices at building construction

jobs . . . on the owner and general contractor, instead of on

workers, who are scarcely in a position to protect themselves

from accident" (Zimmer, 65 NY2d at 520 [internal citations and

quotation marks omitted]).  That is, the Legislature intended "to

force owners and contractors to provide a safe workplace, under

pain of damages" (Blake, 1 NY3d at 286).  Thus, we have "long

held that 'this statute . . . undoubtedly is to be construed as

liberally as may be for the accomplishment of the purpose for

which it was thus framed'" (id. at 292, quoting Quigley v

Thatcher, 207 NY 66, 68 [1912]).

Nevertheless, "the language of Labor Law § 240 (1)

'must not be strained' to accomplish what the Legislature did not

intend" (id. at 292, quoting Martinez v City of New York, 93 NY2d

322, 326 [1999]) because "[t]he point . . . is to compel contractors and owners to comply with the law, not to penalize them when they have done so" (id. at 286).  Owners and contractors, therefore, have "'strict' or 'absolute' liability" only for those statutory violations that proximately cause an employee's injury (id. at 289; see also Duda v Rouse Constr. Corp., 32 NY2d 405, 410 [1973]).  Stated differently, where a plaintiff is the sole proximate cause of his or her injury, there can be no liability under section 240 (1) (see Blake, 1 NY3d at 290).  This is because "it is conceptually impossible for a statutory violation (which serves as a proximate cause for a plaintiff's injury) to occupy the same ground as a plaintiff's sole proximate cause for the injury" (id.).

Here, as acknowledged by both Judge Read in her dissent (see dissenting op. at 13) and Justice Feinman in his dissent at the Appellate Division (see 110 AD3d at 634), there is at least a question of fact regarding whether defendants provided plaintiff with "proper protection" by furnishing (or failing to furnish) him with an adequate safety device (Labor Law § 240 [1]).  Moreover, IMS -- not plaintiff and the other PAL workers -- was charged with the responsibility to ensure that the manhole was covered.  Notably, at the time of the accident, the IMS safety representative was sitting in his car a few feet away from the site.  Therefore, even assuming that plaintiff disregarded safety instructions by disassembling the enclosure before the manhole

was covered (see dissenting op. at 12), there is a question of fact regarding whether the absence of the IMS representative, and his failure to ensure that the manhole cover was immediately replaced, contributed to the accident.

In any event, the adequacy of the manhole cover as a safety device is called into question by the testimony of IMS president Joseph Mazzurco. Mazzurco testified that an open manhole must be surrounded by a three-sided guard rail system to comply with safety standards. Although Mazzurco did not testify as an expert witness in this case, he had personal knowledge of the appropriate safety procedures at the site of plaintiff's accident because PAL hired IMS as the site safety contractor. Determining Mazzurco's credibility is the province of the jury. Moreover, state and federal regulations support Mazzurco's testimony (see Department of Labor Regulations [12 NYCRR] § 23-1.7 [b] [1] [i] ["(e)very hazardous opening into which a person may step or fall shall be guarded by a substantial cover fastened in place or by a safety railing constructed and installed in compliance with this Part"]; 29 CFR 1910.23 [a] [6] ["[w]hile the cover is not in place, the manhole opening shall be constantly attended by someone or shall be protected by removable standard railings"]). Because defendants failed to establish as a matter of law that they provided "proper protection" through adequate safety devices, their motion for summary judgment should be denied (cf. Stolt, 81 NY2d at 920; Zimmer, 65 NY2d at 523-524).

Additionally, other evidence presents an issue of fact regarding whether plaintiff's conduct was the sole proximate cause of his accident. The record contains conflicting testimony concerning whether the area surrounding the manhole was illuminated at the time of the accident. Specifically, although plaintiff alleged that the lights had been turned off in the containment enclosure, the asbestos handler supervisor for the New York City Transit Authority testified that the lights were on after plaintiff fell into the manhole. This testimony raises a triable issue as to whether plaintiff could or should have observed that the manhole cover was missing when he fell.

My dissenting colleague contends that plaintiff was the sole proximate cause of his injuries because he disobeyed his supervisor's instructions to cover the manhole before deconstructing the containment enclosure (see dissenting op. at 12). While I agree that, as a general rule, a plaintiff is not entitled to summary judgment when he or she "received specific [safety] instructions . . . and chose to disregard those instructions" (Cahill v Triborough Bridge & Tunnel Auth., 4 NY3d 35, 39 [2004]), the facts here do not establish that plaintiff was the sole proximate cause of his injuries as a matter of law. To be sure, a jury could reasonably conclude that the accident would not have occurred if plaintiff had followed his supervisor's instructions. However, a reasonable jury could also find that defendants' failure to provide him with "proper

protection," combined with insufficient illumination --
preventing plaintiff from discovering that the manhole was
uncovered -- was a proximate cause of plaintiff's injuries.  If
the latter, plaintiff would, at most, be contributorily negligent
for disregarding his supervisor's instructions.  As noted above,
such contributory negligence is not a defense to a Labor Law §
240 (1) violation (Stolt, 81 NY2d at 920).  Thus, it is for the
factfinder -- not this Court -- to resolve the question of
proximate cause.

In sum, I conclude that questions of fact exist
regarding whether defendants provided plaintiff with "proper
protection" and whether plaintiff's conduct was the sole
proximate cause of his injuries.  Accordingly, I would modify by
reversing the Appellate Division order insofar as it affirmed the
grant of summary judgment to defendants, deny summary judgment to
plaintiff and defendants, and remit to Supreme Court for further
proceedings.

Barreto v Metropolitan Transportation Authority

No. 33

READ, J. (DISSENTING):

Plaintiff Raul Barreto, who worked as an asbestos handler for P.A.L. Environmental Safety Group (PAL), suffered on-the-job injuries when he fell into an open manhole because he failed to follow his supervisor's instruction not to begin to disassemble the temporary wooden enclosure surrounding the manhole until its cover had been put back in place. Since plaintiff's own actions were the sole proximate cause of his accident, the owners and general contractors -- the City of New York (the City), the New York City Transit Authority (NYCTA) and the Metropolitan Transit Authority (MTA) -- are entitled to summary judgment dismissing plaintiff's claim against them under Labor Law § 240 (1).[1] At a minimum, as Judge Stein points out,

_____

[1]The question whether an uncovered manhole constitutes an elevated work site or presents an elevation-related hazard within the meaning of Labor Law § 240 (1) has divided the Appellate Division (compare Dos Santos v Consolidated Edison of N.Y., Inc., 104 AD3d 606, 608 [1st Dept 2013] [plaintiff who fell into an uncovered manhole suffered injuries "result(ing) from an elevation-related hazard that Labor Law § 240 (1) is intended to obviate"] and Allen v City of Buffalo, 161 AD2d 1134, 1134 [4th Dept 1990] [under the circumstances described, "the uncovered manhole through which decedent fell was an elevated worksite"] with Carey v Five Bros., Inc., 106 AD3d 938, 940 [2d Dept 2013] [injuries suffered by a worker who fell partially through an open manhole "did not arise in the context of the 'special hazards' against which (section 240 [1]) is designed to protect"]; see

- 1 -

on plaintiff's theory of the case there exist questions of fact sufficient to deprive him of partial summary judgment on liability under section 240 (1), the remedy endorsed by the majority.

I.

In January 2005, NYCTA and MTA were in the midst of the SONET communications project, which entailed, in the phase then underway, removal of asbestos insulation from underground cables, which were accessed through several hundred individual manholes. The manholes led to confined underground spaces or chambers that were, on average, about 10 feet by 15 feet, anywhere from 10 to 40 feet underground.  MTA/NYCTA hired PAL to remove the asbestos insulation from the cables and any asbestos-containing debris. PAL, in turn, retained IMS Safety Corp. (IMS) as its site safety consultant.  In January 2005, PAL was working in spaces accessed through manholes located along Lafayette Street in lower Manhattan.

The asbestos abatement work began after dark and carried over into the early morning hours.  On the shift

---

also Coleman v Crumb Rubber Mfrs., 92 AD3d 1128 [3d Dept 2012] [a worker injured when he partially fell through an unprotected opening in a permanent floor "was not performing work at an elevation" or any task "warrant(ing) the use of the protective devices required by Labor Law § 240 (1)"]).  For the reasons stated by the majority, I also assume, solely for purposes of this appeal, that plaintiff was engaged in work presenting an elevation-related risk when he was injured (see majority op at 6).

beginning on January 8 and ending on January 9, 2005, plaintiff was a member of a five-person PAL crew working at manhole 8A on Lafayette Street. The PAL workers cordoned off the area where manhole 8A was located, apparently in or near a parking lane. PAL supplied a generator to power lights to illuminate the work area; specifically, four portable 500-watt halogen lights mounted at street-level on stands.

The PAL workers built a temporary wooden enclosure around the manhole. This enclosure was described variously as either an eight- by eight-foot or nine- by nine-foot square; i.e., the size of a small room or shed. As recounted by the MTA's supervisor on the project, the PAL workers constructed three complete and one partial wall around the manhole by erecting and nailing together wooden panels, leaving a three-foot wide opening on the incomplete side. They installed 2 X 4's diagonally across the top of the enclosure, nailed them into the panels to brace the walls and glued and stapled heavy plastic to these wooden beams to create a ceiling; they placed a double layer of heavy plastic on the enclosure's interior walls and floor (i.e., the street) and cut out the plastic around the manhole, which was three or four feet in diameter, to expose it.

When this preparatory work was complete, the PAL crew removed the manhole cover to an area outside the enclosure. The IMS safety inspector dropped a gas monitor into the manhole to measure carbon dioxide, oxygen and methane to make sure that the

air in the confined underground space was safe to breathe.  This monitor remained in place and was connected to an audible alarm to alert the IMS inspector, who was stationed outside the enclosure during the shift, if air quality ever deteriorated to unacceptable levels.

Once the IMS safety inspector confirmed that air quality was acceptable, the PAL workers placed a ladder in the manhole.  The ladder extended two or three feet above the level of the enclosure's floor, which was itself roughly 10 feet above the floor of the underground chamber reached through manhole 8A. The MTA cable foreman climbed down the ladder to make sure there were no high tension (i.e., more than 600 volts) positive feeders present.  Once he confirmed this was the case, the PAL workers put an airlock into place to cover the three-foot opening in the enclosure's one partial wall,[2] and descended the ladder into the underground space to begin asbestos removal.  They were dressed in protective clothing (two complete suits), and were equipped with respirators and 300-watt portable halogen lights.  The MTA supervisor and the MTA cable foreman remained at the work site, outside the enclosure, throughout the shift; they spelled each other so at least one of them was always watching the enclosure's entrance at the airlock to make sure no member of the public

---

[2]The airlock is the system of two plastic-curtained doorways separated by an estimated four feet described by plaintiff.  The purpose of an airlock is to permit entrance and exit while restricting air movement between a contaminated area and an uncontaminated area (see 15 RCNY § 1-02).

intruded.

Once the PAL workers had completed their asbestos abatement work for the shift, they handed up or carted bagged asbestos-containing materials and any tools through the manhole opening into the enclosure.  Then they pulled up the ladder. After the IMS safety inspector removed his monitoring equipment from the manhole opening, the PAL workers were supposed to take out the airlock, retrieve the manhole cover from outside the enclosure and cover the manhole.  Only then were they required to disassemble the enclosure.  The MTA supervisor testified that "[t]he lights are the last thing that they take down because they have to see.  That's a common practice.  That's the last thing they do."  After learning about plaintiff's accident from the PAL supervisor, the MTA supervisor went to manhole 8A.  He observed that both the 500-watt halogen lights and the 300-watt portable lights were present and illuminating the area.

## II.

Plaintiff conceded that he knew that he and his co-workers were not supposed to dismantle the wooden enclosure until the cover for manhole 8A had been put back in place.  Yet, on January 9, 2005, after the PAL crew completed asbestos abatement work in the underground chamber and plaintiff and his co-workers emerged from the manhole opening, he "right away" began disassembling the enclosure, contrary to his supervisor's explicit instructions.  Stated somewhat differently, plaintiff

did not wait for the manhole to be covered, as he had on previous occasions and as he knew he was supposed to do.  Plaintiff offered no explanation for his safety lapse, or for his assumption that the manhole must have been covered even though he admittedly was not advised by his supervisor that this was the case, and he did not see his co-workers replace the cover.

Specifically, plaintiff testified as follows:

"Q.  Were you aware through your prior work at job sites involving asbestos removal in manholes, that the cover to the manhole should be replaced once the workers and materials were removed from the manhole?

"[Plaintiff's attorney]:  Yes or no?

"[Plaintiff.]  Yes."

At another point in his deposition, plaintiff testified additionally as follows:

"Q.  When you deconstructed the work area[,] what is the first thing that you do?

"[Plaintiff's attorney.]  You mean on [January 9, 2005] or generally?

"Q.  Generally?

"[Plaintiff's attorney.]  Any manhole job generally.

"Q.  Yes, just generally.

"[Plaintiff.]  To cover the hole.

"Q.  And what would you do next, generally.

"[Plaintiff.]  Remove plastic."

And later, plaintiff was questioned and answered as follows:

"Q.  On the date of your accident, at any time, did the

supervisor from P.A.L. tell you that the manhole had to be covered, not by you, but just that it had to be covered before you began the deconstruction of the area?

"[Plaintiff.]  Yes.

"Q.  When?

"[Plaintiff.]  When we began the break down.

"Q.  That was the day of your accident, correct?

"[Plaintiff.]  Correct.

"Q.  On the day before your accident, not the day of your accident, but the day before your accident, did you ever see the manhole being covered by someone?

"[Plaintiff.]  Clearly.

"Q.  Did you ever cover the manhole with the cover on the days before your accident?

"[Plaintiff.]  No.

"Q.  Who would cover the manhole?

"[Plaintiff.]  The supervisor would say who would cover it.  I don't know.

".  .  .

"Q.  On the days before your accident, not on the day of your accident, but on the days before your accident, when you would start deconstructing the work area, were the manholes covered?

"[Plaintiff.] Yes.

"Q.  Would you usually wait for the manhole to be covered before you would start the deconstruction of the area?

"[Plaintiff.]  Yes.

"Q.  When you would wait for the manhole to be covered, where would you wait?

"[Plaintiff.]  We would go to the area.  There is two

areas for decontamination, one area is where the curtains are [i.e, the airlock].  I don't know who covered -- then after it was covered the supervisor would tell us to go in and begin the deconstruction.

"[Plaintiff's attorney.]  All I want to know from you, on previous manhole jobs, where would you wait for someone else to put the cover on, that is all I wanted to know?

"[Plaintiff.]  In the curtain area, at the curtain [i.e., in the airlock].

". . .

"Q.  So, typically, you would wait in that area when they would place the manhole, cover the manhole; is that what you are telling me?

"[Plaintiff.]  Yes.

". . .

"Q.  The days before your accident, would you typically wait for the supervisor to say okay the manhole is covered before you began your deconstruction?

"[Plaintiff.]  Yes."

We have long held that "[e]ven when a worker is not 'recalcitrant,' . . . there can be no liability under section 240 (1) when there is no violation and the worker's actions . . . are the 'sole proximate cause' of the accident" (Blake v Neighborhood Hous. Servs. of New York City, Inc., 1 NY3d 280, 290 [2003] [emphasis added]; see also Cahill v Triborough Bridge and Tunnel Auth., 4 NY3d 35 [2004] [fact issue exists whether the plaintiff's actions were the sole proximate cause of his injuries when he ignored his supervisor's specific instruction to use an available safety line while climbing]).  Here, the majority concludes that plaintiff established, through the testimony of

IMS's president, Joseph Mazzurco, that there was, in fact, a violation because "there should have been a guard rail system around three sides of the open manhole while the containment enclosure was being dismantled," and that "the absence of guard rails was a proximate cause of the accident because had they been in place[, plaintiff] would not have fallen" into the manhole (majority op at 6 [emphasis added]).  This theory is flawed for several reasons.

First, Mazzurco did not testify as a safety expert. Rather, he described IMS's role on this project, which he tended to diminish, and his guilty plea to federal mail and wire fraud charges based on alleged falsification of the qualifications and training of certain IMS employees.  When asked if it "[w]ould be part of IMS'[s] responsibilities to insure that a manhole was covered . . . before PAL began working around the manhole above the surface -- on the street level," Mazzurco answered "hypothetically" that "[i]f there is protection around [the manhole], then [it's] not our responsibility because the manhole is protected."  When asked what he meant by protection, he responded "[s]ome sort of barricade system."

Second, to the extent Mazzurco assumed there was, or should have been, a guard rail system in place around manhole 8A while it was open, he cited no state or federal regulation that compels this.  Nor is such a measure mandated by the only regulations that plaintiff mentions; namely, 29 CFR 1910.23 (see

29 CFR 1910.23 [a] [6] [when the required standard manhole cover is not in place, an uncovered floor opening "shall be constantly attended by someone or shall be protected by a removable standard railing"] [emphasis added]), and 29 CFR 1926.  The latter provision, which is part of OSHA's safety and health regulations for construction, states at 29 CFR 1926.501 ("Duty to have fall protection") as follows:

> "(a) General. (1) This section sets forth requirements for employers to provide fall protection systems . . . (b) (4) Holes. (i) Each employee on walking/working surfaces shall be protected from falling through holes (including skylights) more than 6 feet (1.8 m) above lower levels, by personal fall arrest systems, covers, or guardrail systems erected around such holes" (emphasis added).

And finally, the protection that the majority claims should have been provided (i.e., a "guard rail system around three sides of the open manhole while the containment enclosure was being dismantled") makes no sense because the manhole was supposed to be covered before the PAL workers began to disassemble the enclosure.  In fact, at no time were the PAL workers authorized or required to work in the vicinity of an open manhole.  The cover was not removed until after they constructed the enclosure, at which point, upon receiving clearance from the IMS safety inspector and the MTA cable supervisor, they climbed down through the manhole opening into the underground chamber, where they performed their asbestos abatement work.  And the cover was to be replaced once they emerged from the manhole after completing their asbestos abatement work for the shift, and

before they dismantled the enclosure.  A guard rail system, whether installed before or after the PAL workers entered or after they exited the open manhole, would have protected no one other than an intruder, and the enclosure was under constant surveillance by either the MTA supervisor or the MTA cable foreman.

The majority also takes the position that plaintiff's conduct can not have been the sole proximate cause of his injuries because "it took at least two PAL workers to move the manhole cover (given its weight)," and plaintiff testified "that the lights had been turned off prior to disassembly of the containment enclosure" (majority op at 7).  With respect to the first point, this is not a case where a supervisor instructed an employee to use safety equipment that was unavailable or somehow unusable for its intended purpose.  Plaintiff was never told to replace the manhole cover by himself, and whether it took two or more of the PAL workers in the five-person crew to replace the manhole cover is irrelevant.

In contending otherwise, the majority ignores the distinction we have made between the sole proximate cause and "recalcitrant worker" defenses (see Blake, 1 NY3d at 290; Cahill, 4 NY3d at 39-40; Weininger v Hagerdorn & Co., 91 NY2d 958 [1988] [speaking in terms of sole proximate cause and not recalcitrance]; Robinson v East Med. Ctr., LP [2006] [noting that the plaintiff did not avail himself of provided safety devices,

but phrasing the standard as one of sole proximate cause]; see also 85 NY Jur 2d Premises Liability §§ 289 and 290 [identifying sole proximate cause and "recalcitrant worker" as separate defenses to Labor Law § 240 (1) claims]).  In sum, while recalcitrance is a sufficient predicate for sole proximate cause, it is not a necessary one.

There is to be sure a good argument that plaintiff was not a "recalcitrant worker" because he was unable, by himself, to lift the manhole cover.  But plaintiff's foreman instructed him not to begin dismantling the enclosure until the manhole cover had been replaced, and plaintiff disregarded this basic safety direction, which was the sole proximate cause of his accident: obviously, he would not have fallen into the underground chamber through the manhole opening if he had waited for the manhole to be covered, as he conceded he knew he was supposed to do, and had done on previous occasions.  As we observed in Blake, "[e]xtending [Labor Law § 240 (1)] to impose liability in such a case would be inconsistent with statutory goals since the accident was not caused by the absence of (or defect in) any safety device, or in the way the safety device was placed" (1 NY3d at 290).  And it is certainly poor public policy to treat employers that direct their workers how to accomplish a task safely and make adequate safety equipment available just the same as employers that make little or no effort in this regard.

Finally, whether someone removed or turned off the 500-

watt lights outside the enclosure or, for that matter, extinguished the portable 300-watt lights with which the workers were equipped, is disputed. It is difficult to credit plaintiff's testimony in this regard since the PAL workers themselves were responsible for setting up and taking down the lights; it is hard to believe that they wanted to work in relative dark, and equally hard to explain why a blackout occurred for the first time, according to plaintiff, on this occasion. More importantly, though, this disputed fact is beside the point. Dim or nonexistent lighting would, of course, lend greater credence to plaintiff's testimony that he did not notice whether any of his co-workers had replaced the manhole cover or that it was missing, even though the crew was a small one working together in close quarters. It does not, however, explain why plaintiff proceeded to disassemble the enclosure without receiving the "okay" from his supervisor, which he testified that he had waited for in the past.

For all these reasons, I conclude that the City, NYCTA and MTA have shown their entitlement to summary judgment dismissing plaintiff's Labor Law § 240 (1) claim on the ground that plaintiff's conduct was the sole proximate cause of his injuries. And even on plaintiff's theory of the case, as Judge Stein shows, there exist facts from which a jury might find that an adequate safety device was available at the work site; that plaintiff both knew that the manhole cover was available and that

he was expected to wait for it to be replaced before he began to dismantle the temporary enclosure; that he chose for no good reason to go ahead without waiting; and that if he had not made that choice, he would not have been injured (see Cahill, 4 NY3d at 441). Accordingly, I respectfully dissent.

* * * * * * * * * * * * * * * * *

Order modified, with costs to plaintiff Raul Barreto, in accordance with the opinion herein and, as so modified, affirmed, and certified question not answered as unnecessary. Opinion by Judge Pigott. Chief Judge Lippman and Judges Rivera and Fahey concur. Judge Stein dissents in part in an opinion in which Judge Abdus-Salaam concurs. Judge Read dissents and votes to affirm in an opinion.

Decided May 7, 2015